UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X

ANNETTE LEE,                                            :     Case No. 2:26-cv-03244-SIL
                                                       :
                        Plaintiff,                      :     **AMENDED COMPLAINT**
                                                       :     **WITH JURY DEMAND**
            -against-                                    :
                                                       :
NORTHWELL HEALTH, INC., FEINSTEIN                       :
INSTITUTES FOR MEDICAL RESEARCH, and                   :
ELMEZZI GRADUATE SCHOOL OF                              :
MOLECULAR MEDICINE,                                    :
                                                       :
                        Defendant.                      :

-------------------------------------------------------------- X

Plaintiff Annette Lee alleges against Defendants Northwell Health, Inc. ("Northwell Health"), Feinstein Institutes for Medical Research ("Feinstein"), and Elmezzi Graduate School of Molecular Medicine ("Elmezzi") (all Defendants collectively referred to as "Northwell"):

## PRELIMINARY STATEMENT

1. This is a civil action for damages and remedies for unlawful discrimination based on sex, age, race, and national origin, and unlawful retaliation because Lee complained of discrimination, in violation of: (1) Title VII of the Civil Rights Act of 1964, as amended ("Title VII"); (2) 42 U.S.C. § 1981; (3) the Age Discrimination in Employment Act (the "ADEA"); and (4) the New York State Executive Law § 296 et seq. ("NYSHRL").

2. Annette Lee, is a 64-year-old Chinese American woman with over 30 years of experience in educational leadership, combined with an extensive background in cutting-edge scientific research.

3. Lee worked at what became the Feinstein Institutes for Medical Research at Northwell Health, Inc. ("Northwell") for over 20 years, starting in June 2001. She was a faculty

member in the Institute of Molecular Medicine. She was uniquely qualified for her role and her service was exemplary throughout her entire tenure at Northwell.

4. Her last role at Northwell was:

(1) Vice President and Dean of Northwell's Elmezzi Graduate School of Molecular Medicine;

(2) Associate Professor in the Institute of Molecular Medicine; and

(3) Director of the Molecular Biology core facility at The Feinstein Institutes for Medical Research.

5. After over 2 decades of enjoying her dedicated service, on September 30, 2024, Northwell terminated her employment.

6. According to Northwell it terminated her employment because a white man, Peter Hotez, who was not employed by Northwell, raised a preposterous purported concern about her.

7. Hotez is a prominent biologist. He called Kevin Tracey, the Chief Executive Officer ("CEO") of Feinstein Institutes For Medical Research and President of the Elmezzi Graduate School of Molecular Medicine. Hotez and Tracey, also a white man, have known each other for decades. Lee, too, has known Hotez and Tracey for decades. Lee went to graduate school with Hotez and while they were in graduate school, Hotez, Tracey and Lee worked in the same lab.

8. Before terminating her employment Northwell put her on administrative leave.

9. Before Northwell terminated her employment, Lee clearly explained to Northwell Hotez's motivation for calling Tracey—Hotez, who is married, had been repeatedly trying to have a more than friends' relationship with Lee, telling Lee he had been in love with Lee for years, and Lee had been rejecting him.

2

10.     Northwell, however, terminated Lee's employment on September 30, 2024. According to Kathleen Donovan, Chief Human Resources Officer, the decision came from the "highest level" which Lee took to mean Tracey—the older white man who had for decades been friends with the older white man Hotez trying to sleep with Lee, who after being rejected, tried to professionally destroy Lee—and succeeded.

11.     Northwell contends it terminated Lee's employment because Lee was a safety concern, but it strains credulity that Northwell believed Lee to be a safety concern and its behavior immediately following Hotez's call to Tracey shows that.

12.     Northwell's termination of Lee's employment was unlawfully based on Lee's sex, age, race, national origin (Lee's father was born in China), and was retaliatory because Lee complained of discrimination just before Northwell terminated her employment.

**JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, and the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

14.     Lee filed a Charge of Discrimination with the Equal Employment Opportunity Commission naming "Northwell Health, Inc." as the Respondent, and files this Complaint within ninety days of receiving a Notice of Right to Sue. A copy of the Notice of Right to Sue is annexed as Exhibit 1.

15.     Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) (2) because a substantial part of the events or omissions giving rise to Lee's claims occurred in this judicial district, including Lee's employment.

**THE PARTIES**

16.    Plaintiff Annette Lee is a 64-year-old Chinese American woman who was previously employed by Northwell.

17.    Northwell Health is a domestic not-for-profit corporation organized and existing under and by virtue of the laws of the State of New York.

18.    Northwell Health is an integrated healthcare network that is New York State's largest healthcare provider and private employer, with more than 105,000 employees.

19.    The health system spans two states, New York and Connecticut. It comprises 28 hospitals and over 1,000 ambulatory care facilities across Long Island, the five boroughs of New York City, Westchester, the Hudson Valley, and Western Connecticut.

20.    Northwell Health is headquartered at 2000 Marcus Avenue, New Hyde Park, New York 11042.

21.    Northwell Health was Plaintiff Lee's "employer" withing the meaning of Title VII, the ADEA, and the NYSHRL.

22.    Northwell Health, through its agents and employees, controlled the terms and conditions of Plaintiff's employment.

23.    Plaintiff's paychecks and Forms W-2 were issued by Northwell Health.

24.    Feinstein is a domestic not-for-profit corporation organized and existing under and by virtue of the laws of the State of New York.

25.    Feinstein is located at 350 Community Drive, Manhasset, New York 11030.

26.    Feinstein is the home of research at Northwell.

27.     Feinstein was Plaintiff Lee's "employer" withing the meaning of Title VII, the ADEA, and the NYSHRL.

28.     Feinstein, through its agents and employees, controlled the terms and conditions of Plaintiff's employment.

29.     Elmezzi is a private graduate college, located at 350 Community Drive, Manhasset, NY 11030.

30.     Elmezzi is an individually tailored three-year program designed to train exceptional physicians with a recent MD or equivalent degree in research methodologies, culminating in a PhD in Molecular Medicine.

31.     Elmezzi is located at North Shore University Hospital.

32.     Elmezzi is part of Feinstein, which is Northwell's principal research facility.

33.     Elmezzi was Plaintiff Lee's "employer" withing the meaning of Title VII, the ADEA, and the NYSHRL.

34.     Elmezzi, through its agents and employees, controlled the terms and conditions of Plaintiff's employment.

35.     Defendants were Plaintiff's joint employer:

    a.     Defendants all suffered or permitted Plaintiff to work;

    b.     Each of the Defendants acted directly or indirectly in the interest of one another in relation to Plaintiff;

    c.     Defendants all simultaneously benefitted from Plaintiff's work.

    d.     Defendants each had either functional and/or formal control over the terms and conditions of Plaintiff's work;

e.     Plaintiff performed work integral to each Defendant's operation;

f.     Each Defendant had substantial control over Plaintiff's working conditions;

g.     Defendants' operations were interrelated and unified; and

h.     Defendants shared a common management and were centrally controlled and/or owned by Defendants.

## FACTUAL ALLEGATIONS

**1.     Throughout 2024, Peter Hotez, A Prominent Biologist, Who Does Not Work At Northwell, Made Sexual Advances On Lee And Lee Rejected Him.**

36.     Throughout 2024, Peter Hotez, a prominent American biologist at Baylor College of Medicine, in Houston, Texas, made sexual advances towards Lee and Lee rejected him.

37.     Although Hotez and Lee were both at The Rockefeller University until Hotez graduated in 1986, they had no significant contact until 2019. They connected in October 2019 at a birthday celebration for their mutual mentor, Anthony Cerami.

38.     Between 2019 and 2023-24, Hotez's and Lee's correspondence was limited to email contacts discussing Cerami's failing health.

39.     Lee nominated Hotez for the Cerami Award; this award was presented to him on May 22, 2024, at the Feinstein Academy of Scholars Symposium.

40.     Following the symposium, Hotez and Lee had drinks at the symposium location, and Hotez unexpectedly confessed that he had been in love with Lee since graduate school. That evening, he also asked for Lee's cellphone number so that they could communicate more freely and informally.

41. Lee was unsure what to do, but Lee went home, texting Hotez to let him know that she was home safe.

42. Hotez responded, "So glad. Love you, get some rest".

43. On May 30, 2024, Hotez and Lee had a telephone conversation where he repeated that he loved Lee.

44. Beginning on June 6, 2024, Hotez began randomly sending Lee text messages about the awards that he received. These awards were not connected to Lee or her work, and Lee could only conclude they were simply intended to impress Lee.

45. On June 13, 2024, Hotez texted Lee "Miss you, let's talk again when I'm back in similar time zones, you keep me calm" and that he would like to bring Lee along to one of his scientific conferences, even though they have no common research interests.

46. On June 19, 2024, Hotez texted Lee that he "totally lost it" that day, that he just "sat there and wept like a crazy person." He went on to say that "[he] didn't even give a shit and now [he was] so embarrassed."

47. The next day, Lee called Hotez to make sure he was ok. He again professed his love for Lee, and when Lee rejected him on the grounds he was married, Hotez told Lee about his various extra-marital affairs. Lee expressed strong concerns about this admission, particularly given his notoriety in his field, but he went on to say that he would "give them all up" for Lee.

48. Hotez told Lee he was going to be in New York City on June 26, 2024, and asked Lee to meet him. Lee declined and told him Lee had early morning meetings the following day.

49. Lee told him that their relationship should be kept friendly, not sexual.

50.     Hotez called Lee again on July 10, 2024, and throughout all this time, he continued sending random text messages about the awards and developments in his professional life.

**2.     On August 12, 2024, There Was A Fire At The Feinstein Institutes At Northwell, Causing Significant Damage And Giving Rise To Extremely Stressful Work Conditions Over The Next Month.**

51.     On August 12, 2024, there was a fire at the Feinstein Institutes at Northwell, causing significant damage and giving rise to extremely stressful work conditions over the next month. Lee told Hotez about the fire and ensuing disruption for her lab.

52.     While the institute building's old wing floors 1 - 3 suffered significant damage and was completely shut down, the new wing along with the fourth floor of the old wing was reopened on September 5, 2024.

53.     The fire displaced researchers who were given shared space in the new wing and on the fourth floor of the old wing, resulting in a cramped space where at least three people shared every chair and lab space was also extremely limited.

54.     Lee's group and others were unable to do anything productive since the assigned space also lacked essential laboratory supplies, so she either worked from home or from a temporary space within the building.

55.     Lee's lab was on the second floor of the old wing, which reopened on September 16, 2024. After it reopened, however, Lee was told that they would have to make room for at least 9 workers displaced from the third floor, which had been irreparably damaged and would take two years to renovate.

56.     This would nearly double the number of workers in Lee's lab space, which hosted 12 workers assigned to four lab groups, prior to any new arrivals.

8

57.     Lee's team was given specific and direct instructions that the lab space had to be cleaned and reorganized to accommodate the new researchers by the end of that week, so they spent the entire week cleaning and making space. No significant research was done.

58.     On September 23, 2024, this process was still underway. In addition to bench space, the displaced lab group would need space for refrigerators, freezers, and equipment.

59.     Lee's team all did their best to make room, but the heads of the three other lab groups in the shared space Lee's lab occupied began taking issue with how Lee organized her freezers and refrigerators.

60.     They also took issue with the fact that one of Lee's freezers needed to be defrosted even though Lee pointed out that defrosting would take three days, no temporary freezers were available, and that the current priority was making space, which could be done without defrosting Lee's freezers.

61.     They also took out certain biological and chemical reagents from another freezer to point out that some were expired; Lee noted that others in that freezer were not.

62.     Lee felt like the victim of a witch hunt—Lee was being dragged to every one of her freezers and refrigerators and criticized and ganged up on by three colleagues—led by an older white man, and two white women, one significantly younger and at a lower level than Lee. They were critical that Lee had so many freezers and refrigerators, but Lee had been in that lab space for much longer than they had been. Lee's refrigerators and freezers should have been no concern to them—these were not shared, and were not going to be shared—laboratory refrigerators and freezers are generally not shared. The displaced colleagues from the third floor were bringing their own refrigerators and freezers.

63.     When they criticized Lee, Lee did not confront them. When they would say something was expired, Lee would say "okay." Lee just wanted to move on to being productive after this fire disruption.

64.     A look in one of Lee's refrigerators showed cell culture media dated 8/9/24. Before they could get a comment out, Lee reminded them that it was the last day they were in the lab before the fire, and they had not been able to do any cell culture since then. Lee told them once we could, we would properly dispose of the expired cell culture media.

65.     Lee also told them the issue they were raising did not matter as they were not going to dispose of any refrigerators or freezers, even if Lee condensed their contents. They themselves were not moving the refrigerators and freezers—a moving company had been hired to move them. While Lee did not confront them about their inappropriate and aggressive criticisms of her, obviously, as a senior scientist, their barrage of criticisms against Lee was hurtful and frustrating.

66.     Leadership compounded this stress with inconsistent direction and limited planning. Before the fire, there had been a plan to renovate the second floor and move all the labs from there, including Lee's, to temporary locations within the building. With the fire damage on the third floor, there was now talk of a plan to renovate both the second and third floors at the same time to save time and money.

67.     Additionally, there was talk about moving the displaced labs to an offsite location.

68.     The uncertainty regarding this plan left Lee in a stressful limbo.

**3.      Lee Vented To Peter Hotez, Who Had Reached Out To Lee In The Weeks Prior To This Stressful Situation.**

69.     On September 17, 2024, late at night, Hotez texted Lee:

"Missing you, let's try to talk next week, I'm in Boston the rest of this week";

"Seriously I really miss you, I think about you, and in a nice way. I don't have a lot of brilliant friends who just get it and understand things. Maybe it's our Boston origins. I love you truly"; and

"You should call and text me more often and I will do the same. You are an important person in my life."

70.    Following the intensely stressful day Lee had on September 23, Lee texted Hotez, joking that Lee should be kept away from a firearm. It was a joke and having known Lee for this long, Hotez would have known it was a joke.

71.    Lee referred to an AR-15 that Lee had years before purchased as a surprise for her daughter. Lee's daughter was in the ROTC and had complained in approximately 2016 she was the only one in her Army field exercise never to have fired a gun before.

72.    The following morning, Hotez responded to ask what was going on. Lee responded: "I hate working with stupid people who can't keep themselves out of my business and feel the need to tell me how I'm not doing things right. Heading to the gym before work. Leaving the rifle at home for the time being," making a clear joke that Hotez would have known was a joke—Hotez absolutely knows Lee is no danger.

73.    At 7:58 a.m. that morning, he texted Lee that he was worried and would be calling Lee. Lee was in a gym class and did not see this message until about 8:50 a.m., when Lee responded: "I'm fine just very frustrated."

**4.      At About 12:30 P.M. That Day, Lee Received A Message That Kevin Tracey Wanted To Meet With Lee.**

74.      At around 12:30 p.m., while Lee was attending an in-house heavily attended scientific seminar, Lee received a message indicating that Kevin Tracey wanted to meet with Lee at 1:00 p.m.

75.      Lee had no idea what the meeting was going to be about.

76.      When Lee arrived at Tracey's office, in the executive suite, Lee was directed to a conference room.

77.      Kathleen Donovan, Chief HR Officer Ambulatory Region & Feinstein Institute for Medical Research, was there.

78.      Joseph Clark, the head of security, was also there.

79.      John Amodeo, who Lee did not know, was also there.

80.      Donovan is white, Clark is white, and Amodeo is white.

81.      When Lee saw Donovan and Clark, Lee thought the meeting was about an ongoing discrimination legal matter raised by a white man.

82.      Before the meeting started, Lee was talking to Donovan about the gym they both frequented.

83.      Lee then conversed with Clark, saying that Lee remembered meeting him before in connection with the above discrimination legal matter, but he said he did not think so. Eventually he did remember. But because he did not initially remember, it dawned on Lee that this meeting was not about that discrimination legal matter, or Clark would have outright remembered meeting her.

84.      They continued to chit chat.

12

85.     Then Tracey came in and said he wanted Lee to speak with Donovan and Clark and added something to the effect of "everything will be okay," "this will pass" or something like "we will get through this." Lee had no idea what Tracey was talking about. This was the last time Lee saw Tracey.

86.     Then Donovan started talking to Lee about her text messaging with Hotez.

87.     Donovan referenced gun violence.

88.     Lee then realized what was going on.

89.     Lee made absolutely clear she had no intention whatsoever of using any gun.

90.     Donovan then said Clark was going to interview Lee, with John Amodeo. Donovan stayed during the interview, taking notes. Lee does not recall Amodeo asking her anything.

91.     Clark asked Lee questions about the gun and why Lee had it.

92.     Lee explained Lee had purchased it when her daughter was in ROTC and had complained that she was the only one on the Army field exercise who had never fired a gun before.

93.     In October 2016 or maybe 2017, Lee had bought the gun so when she came home at Thanksgiving she could practice before the next Army ROTC field outing, thinking that it would take 4-6 weeks for Lee to be approved to purchase the gun. Lee had no idea that it was a relatively short and effortless process, and Lee could leave with the gun the same day. Joseph Clark asked if Lee would surrender the gun to him and Lee said of course.

94.     Lee made clear that her texts to Hotez were in jest.

95.     Northwell then had Lee meet with Matthew Mitchell, a clinical psychologist. Mitchell is also white. Mitchell asked Lee whether Lee had problems with drinking or drug use. Lee explained she did not.

13

96.     He asked Lee if Lee was sleeping well, and Lee responded that she slept just fine. Lee told him Lee could show him on her phone because she wore a biometric health monitor that tracks her sleep cycles, but he declined.

97.     Mitchell cleared Lee to return home alone, after first asking Lee if her doing so was safe. Lee answered yes.

98.     Donovan then informed Lee that she would be placed on administrative leave, but that Lee could return to the lab on September 30.

99.     Lee was very concerned about her lab as she had only just returned following the fire and had eye surgery scheduled for October 1 which Lee conveyed to Donovan.

100.    Lee asked whether she could return earlier if she surrendered the gun to security and sold the gun the following day. Donovan was noncommittal, but it was agreed that Clark and Amodeo would meet Lee at her home and take the gun to Northwell security until it could be sold back to the local gun store where Lee bought it.

101.    Lee was allowed to pack up a few things from her office and went home.

102.    When Lee arrived at her home, Clark and Amodeo were right behind her. There was no loaded gun at her house. It was in a basement closet, unloaded. It had not been used since 2017 or 2018. They went down to Lee's basement, and when Clark and Amodeo searched the gun case, they also found a small caliber rifle that Lee's ex-partner had left behind. Lee told them that they could take it as Lee wanted nothing to do with any gun. Lee was not even aware of it being there.

103.    They agreed to meet the following day at the place where the guns were purchased to sell them back. Lee confirmed the store hours and called Clark around 4 p.m. to tell him that the

store opened the following day at 10 a.m. Lee offered to meet him then, but he said he would reach out to confirm the time in the morning.

104.    Donovan emailed detailing this plan, including a directive that Lee return to work on September 30.

### 5.    On September 27, 2024, Donovan Emailed Lee That Northwell Had "Completed [Their] Review."

105.    On September 27, 2024, Donovan emailed Lee:

> I hope that you are doing ok. We have completed our review of the events of this past week and wish to discuss next steps. I am scheduling a virtual Teams meeting with you for Monday morning. Please do not come into the Feinstein on Monday.

Lee accepted the invite.

106.    On September 30, at 7:14 a.m., Lee emailed Donovan:

> Dear Kathleen:
>
> I was supposed to return to work today, but you notified me on Friday not to come in.
>
> I am dismayed that my long-time employer seems to be crediting a high-profile man, Peter Hotez, over me, a woman who has dedicated her services to it for over twenty years. I have been an exemplary employee, with an unblemished record.
>
> I tried to give you more information when we met on September 24, but you were focused on Dr. Hotez's purported concerns and would not let me provide you information.
>
> Prior to Dr. Hotez coming to Kevin Tracey with his purported concerns, he had repeatedly made sexual advances toward me that I did not entertain.
>
> In fact, days before he came to Northwell, on September 17, 2024, Dr. Hotez again told me he loved me. This is just one instance.

15

Dr. Hotez before this had also professed his love for me and that told me he wanted us to have a closer relationship. I declined, and said he was married. He told me about his repeated marital affairs and joked about how much Cialis he had purchased. I was disturbed by all the women he described and told him that being the high-profile person that he is, he should be more discreet and stay out of the backseat of cars. Dr. Hotez told me he would give up all these women for me and I declined and said I did not want to be more than friends and said that I did not want a sexual relationship.

This past summer, Mr. Hotez was in New York City and wanted me to meet him in the city. I refused and told him I had early meetings the next day.

Dr. Hotez is a disgruntled man who has been denied by me and I hope he is not successful at destroying my achieved career.

I have proof to support the above, including documentary proof. Please I request an investigation.


Best,

Annette


107.    Donovan responded at 9:19 a.m.:

Annette
Please allow me to acknowledge receipt of your email.  I am sorry for the described challenges with Peter Hotez, *Dean of the School of Tropical Medicine*, Baylor College of Medicine and do encourage you to take appropriate actions in response.
Our discussions with you are focused only on your actions.
We will continue our discussions at 10 am today.
Thanks


108.    Donovan and Clark were present when Lee joined the virtual meeting. During the virtual meeting, after confirming that no one was present, recording or listening on Lee's end, Donovan began reading what Lee believes was a scripted message. Donovan conveyed that Northwell was terminating Lee's employment.

109.    Lee pleaded with Donovan, bringing up her 23 years of exemplary employment and Hotez's advances that Lee had rejected.

110.    Donovan told Lee she would not normally under the circumstances be eligible for a severance payment. But according to Donovan, Northwell was offering Lee a severance payment because of Lee's 23 years with Northwell.

111.    Lee was not even given an opportunity to formally resign her membership from numerous Northwell and non-Northwell committees nor was Lee able to contact any of her scientific collaborators since her email access was rescinded at 11:30 a.m., and Lee did not have access to their email addresses.

112.    At the time of Lee's termination, Lee had been awarded a $1.3 million grant from the Department of Defense to study metastatic renal cancer that began on August 1, 2024.

113.    Lee also had approximately six weeks of accumulated paid time off ("PTO") that Lee never used. Northwell has yet to pay Lee for any of this PTO.

114.    After Lee's termination, Meredith Burcyk met with my administrative assistant, Octavia Davis, and told her Lee was no longer at Northwell. Davis, Lee believes, was shaken and texted Lee to make sure Lee was okay.

**6.    On October 1, 2024—The Day After Lee's Termination—Lee Had Her Scheduled Eye Surgery.**

115.    On October 1, 2024, the day after Lee's termination, Lee had her scheduled eye surgery.

17

116.    At ~11:30 a.m., Tracey and Andrew Yacht, Chief Academic Officer, also another white man, asked Ms. Davis to schedule a meeting with all the Elmezzi students and Lee's three laboratory technicians.

117.    Tracey told everyone Lee had left Northwell / Feinstein, and that he could not share any details, just that it was sudden and unexpected.

118.    On Wednesday, October 2, 2024, at 8 a.m., Lee had her first follow up visit for her eye surgery.

119.    At 11:15 a.m., Lee received an email from human resources stating that Lee's health benefits ended September 30, and Lee was to return Northwell items (laptop, keys, badge, notes, files) by October 9.

120.    At about ~4 p.m., Tracey and Yacht emailed all Feinstein employees regarding the organizational change.

121.    According to the email, the previous Dean, Bettie Steinberg, who is White, would be running the graduate school in the interim while they do a national search for a replacement Dean—for Lee's replacement. The email thanked Lee for 23 years of service and wished her well.

122.    Lee received several phone calls and text messages from colleagues expressing concern.

**7.    On October 3, 2024, Lee Requested From Donovan A Contact For Lee's COBRA Benefits.**

123.    On October 3, 2024, Lee turned 63.

18

124. At 9:14 a.m., Lee emailed Kathleen Donovan to request a contact for her COBRA benefits since Lee had her scheduled eye surgery on October 1 and learned on October 2, that Lee did not have health insurance.

125. Lee also requested to have her administrative assistant, Octavia Davis, pack Lee's personal belongings from her office.

126. On October 4, 2024, Donovan responded that Lee would be receiving paperwork from Northwell within 2 weeks to sign up for COBRA benefits. Lee was also looking into having Davis pack Lee's personal things from her office.

**8.    On November 12, 2024, Lee Received A Text From Daniel Grande, A Co-Defendant In A Certain Legal Case.**

127. On November 12, 2024, Lee received a text from Daniel Grande, a White male co-defendant in a certain legal case involving claims of discrimination brought by a White man.

128. Grande informed Lee that the matter was settling, and his deposition was being canceled. Later in December, he informed Lee that a settlement amount could not be agreed and in fact he was being deposed. Ultimately, the deposition was canceled and the matter settled.

129. Northwell never terminated Grande's employment.

130. Lee did nothing wrong regarding this legal case. The complaining White man had been fired, but Lee was not the person who decided to fire him.

**9.    On November 25, 2024, Andrew Shih Initiated A Call With Lee To Discuss Her Grant.**

131. On November 25, 2024, Andrew Shih, a man who was Lee's longtime collaborator in the laboratory, initiated a call with Lee to discuss her grant.

132.    Shih told Lee that Betty Diamond, M.D., a White woman who leads the Institute of Molecular Medicine, said Shih was the most qualified person to implement Lee's grant and that he would be the principal investigator if the United States Department of Defense approved. Another collaborator, Xinhua Zhu, was now harassing Shih for a more active role, but he is not qualified to be more than a collaborator. Zhu, a man, had previously harassed Lee for a more prominent position in the grant. Zhu insisted that his data was stolen, his intellectual property was infringed on, and the grant should have been awarded to him although he did not write one word of the grant, nor make any contributions.

133.    Zhu had threatened Lee that he would contact the Department of Defense and inform them that Lee had stolen his data, and the grant should have been awarded to him. Lee complained to the Chief Academic Officer, Andrew Yacht, about Zhu's threat against her. Lee also complained to the Chief Scientific Officer, Ping Wang, another man. Neither Yacht nor Wang did anything to protect Lee, other than to tell Lee to personally deal with it herself. Zhu was never fired, and now he was tormenting Shih, without repercussions.

134.    Lee told Shih that if the Department of Defense approved him, Lee would help him. Helping him would mean money for his salary through the grant, and also for one of Lee's research technician's salary. And the science they were doing together could be continued.

135.    On December 19, 2024, Lee had lunch with Shih. He told Lee that Zhu from the Cancer Institute was still trying to gain control of Lee's grant, but he did not have the scientific credentials, knowledge, or expertise.

136.    The Department of Defense ("DOD") reached out to the grants management office director of the Feinstein Institutes, Diane Marbury, to see why Lee had not submitted regulatory documents or checked in.

137.    Betty Diamond, Diane Marbury, and a representative from the DOD discussed transferring the grant to Shih. The DOD has asked for a letter from Lee relinquishing the grant. Lee told Shih she would not write that letter. While Lee was willing to help him, Lee did not, of course, want to relinquish the grant permanently away from herself. Shih understood and he said that Kevin Tracey was going to write the letter without Lee's permission.

138.    Lee has since asked the DOD to pause spending grant funds and allow Lee to transfer her grant to the next institution Lee obtains employment at, and the DOD has consented.

## FIRST CLAIM

### (Sex, Race, And National Origin Discrimination
### In Violation Of Title VII Of The Civil Rights Act Of 1964) )

139.    Lee repeats and realleges all of the allegations contained herein, as if specifically set forth herein.

140.    At all relevant times, Lee was an "employee" under Title VII, 42 U.S.C. § 2000e(f).

141.    Northwell is an "employer" under Title I, U.S.C § 2000e(b).

142.    By Northwell's actions described herein, Northwell has unlawfully discriminated against Lee based on her sex, race, and national origin by, among other things, terminating her employment.

143.    Northwell's conduct toward Lee constituted willful sex-, race-, and nation origin-based discrimination.

21

144. Northwell management was aware of the aforementioned discriminatory employments action taken against Lee, knowingly participated in such discriminatory actions, and failed to take remedial action to correct these abuses.

145. Northwell intentionally engaged in the aforementioned discriminatory practices and acted with malice and/reckless indifference to Lee.

146. Lee was severely and adversely affected by Northwell's conduct and the failure to take reasonable steps to ensure that the discriminatory conduct and harassment would not continue, therefore creating a hostile workplace.

147. As a result of Northwell's discrimination, Lee suffered and continues to suffer substantial damages including lost wages and benefits and emotional distress in an amount as yet undetermined.

148. As a result of Northwell's unlawful conduct, Northwell is also liable for punitive damages, interest, attorneys' fees, and costs.

## SECOND CLAIM

### (Unlawful Retaliation Under Title VII )

149. Lee repeats and realleges all of the allegations contained herein, as if separately alleged.

150. Lee is an "employee" under Title VII, 42 U.S.C. § 2000e(f).

151. Northwell is an "employer" under Title VII, 42 U.S.C. § 2000e(b).

152. Lee engaged in protected activity under Title VII by complaining.

153. Northwell unlawfully retaliated against Lee by, among other things, terminating her employment.

154.    As a result of Northwell's actions, Lee has suffered substantial damages, including lost wages and benefits and emotional distress, in amounts to be determined at trial.

155.    Upon information and belief, Northwell has also engaged in this retaliatory conduct with malice and reckless indifference to Lee's federally protected rights. Lee is therefore entitled to punitive damages under Title VII.

156.    As a result of the retaliation described herein, Lee is also entitled to injunctive relief of reinstatement, or front pay in lieu of reinstatement.

## THIRD CLAIM

### (Race Discrimination And Hostile Work Environment
### In Violation Of 42 U.S.C. § 1981)

157.    Lee repeats and realleges all of the allegations contained herein, as if separately alleged.

158.    Lee is Asian and is protected under Section 1981.

159.    Northwell subjected Lee to a hostile work environment as detailed above, and this work environment was hostile as a result of the above conduct.

160.    The behavior described above was not welcome by Lee, and was motivated by the fact that she is Asian.

161.    Northwell took adverse employment action against Lee, including, but not limited to, firing her.

162.    Northwell's conduct towards Lee constitutes an infringement of her right to make and enforce contracts in violation of Section 1981.

163.    Northwell's discriminatory conduct was taken with malice or reckless indifference

to Lee's rights. Lee is therefore entitled to punitive damages.

164. As a result of Northwell's intentional discriminatory conduct, Lee has suffered substantial damages in an amount to be determined at trial.

## FOURTH CLAIM

### (Age Discrimination Under The ADEA)

165. Lee repeats and realleges the allegations contained above as if separately set forth herein.

166. Lee was an "employee" of Northwell under ADEA, 29 U.S.C. § 630(f).

167. Lee who is 64 years old is "at least 40 years of age" for purposes of ADEA, 29 U.S.C. § 631.

168. Northwell is an "employer" under ADEA, 29 U.S.C. § 630(b).

169. By its actions described above, Northwell has engaged in unlawful employment practices in violation of ADEA, 29 U.S.C. §§ 623(a), (c), by discriminating against Lee with respect to her terms, conditions, and privileges of employment because of her age.

170. In addition, Northwell's conduct violated ADEA, 29 U.S.C. § 623(d), when it retaliated against Lee because she complained of discrimination.

171. The unlawful practices complained of above were and are willful within the meaning of ADEA, 29 U.S.C. § 626(b).

172. As a result of the discrimination and retaliation described above, Lee has suffered substantial loss of earnings and benefits, and she will continue to do so in the future. Accordingly,

Northwell is liable to Lee for back pay in an amount to be determined at trial, liquidated damages, mental and emotional anguish, plus interests and costs.

173.    Additionally, Lee is entitled to injunctive relief of reinstatement, or front pay in lieu of reinstatement.

## FIFTH CLAIM

**(Sex, Age, Race, And National Origin Discrimination
Under The New York State Human Rights Law)**

174.    Lee repeats and realleges all of the allegations contained herein, as if separately alleged.

175.    Lee is an "employee" under § 292 of the New York State Human Rights Law.

176.    Northwell is an "employer" under § 292 of the New York State Human Rights Law.

177.    Northwell discriminated against Lee based on her sex, age, race, and national origin, by, among other things, terminating her employment.

178.    As a result of Northwell's discriminatory actions, Lee suffered significant damages, including lost wages and benefits and emotional distress, in amounts to be determined at trial.

## SIXTH CLAIM

**(Unlawful Retaliation Under The New York State Human Rights Law)**

179.    Lee repeats and realleges all of the allegations contained herein, as if separately alleged.

180.    Lee is an "employee" under § 292 of the New York State Human Rights Law.

181.    Northwell is an "employer" under § 292 of the New York State Human Rights Law.

182. Lee engaged in protected activity under the New York State Human Rights Law by complaining.

183. Northwell unlawfully retaliated against Lee by, among other things, terminating her employment.

184. As a result of Northwell's actions, Lee suffered significant damages, including lost wages and benefits and emotional distress, in amounts to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Lee prays that this Court grant her judgment for:

1. her actual damages in an amount to be determined at trial for loss of compensation and benefits, including an award of back pay, with interest, and an award of reinstatement with an attendant compensation increase or front pay in lieu of reinstatement including full fringe benefits and seniority rights;

2. damages in an amount to be determined at trial to compensate Lee for mental anguish, humiliation, embarrassment, and emotional injury;

3. liquidated damages;

4. punitive damages;

5. an order enjoining Northwell from engaging in the wrongful practices alleged herein;

6. reasonable costs, disbursements, and attorneys' fees;

7. post-judgment interest; and

8. all such other relief as this Court may deem just and proper.

## JURY DEMAND

Lee hereby demands a trial by jury on all issues so triable.

Dated: June 1, 2026

Law Office of Andrea Paparella, PLLC

By:    /s/ Andrea M. Paparella
Andrea M. Paparella
134 W. 29th Street, Suite 1001
New York, NY  10001-5304
Telephone: (617) 680-2400
Facsimile: (914) 462-3287
Email: amp@andreapaparella.com